## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Bromerc Ltd. and Mercex Ltd., | |
| Plaintiffs, | Civil Action No. _____ |
| v. | **JURY TRIAL DEMANDED** |
| Arthur J. Gallagher & Co.; Chem-Mod LLC; AJG Iowa Refined Coal LLC; Brandon Shores Coaltech LLC; Canadys Refined Coal LLC; Cope Refined Coal LLC; Coronado Refined Coal LLC; Cross Refined Coal LLC; George Neal North Refined Coal LLC; George Neal Refined Coal LLC; Harrison Refined Coal LLC; Hastings Refined Coal LLC; Jeffries Refined Coal LLC; Joppa Refined Coal LLC; Louisa Refined Coal LLC; Mansfield Refined Coal LLC; Pleasants Refined Coal LLC; Thomas Hill Refined Coal LLC; USA Refined Coal LLC; Wagner Coaltech LLC; Walter Scott Refined Coal LLC; Winyah Refined Coal LLC; and Williams Refined Coal LLC, | |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiffs Bromerc Ltd. ("Bromerc"); and Mercex Ltd. ("Mercex"), for their Complaint

against Defendants Arthur J. Gallagher & Co. ("Gallagher"); Chem-Mod LLC ("Chem-Mod");

AJG Iowa Refined Coal LLC; Brandon Shores Coaltech LLC; Canadys Refined Coal LLC; Cope

Refined Coal LLC; Coronado Refined Coal LLC; Cross Refined Coal LLC; George Neal North

Refined Coal LLC; George Neal Refined Coal LLC; Harrison Refined Coal LLC; Hastings

Refined Coal LLC; Jeffries Refined Coal LLC; Joppa Refined Coal LLC; Louisa Refined Coal

LLC; Mansfield Refined Coal LLC; Pleasants Refined Coal LLC; Thomas Hill Refined Coal

LLC; USA Refined Coal LLC; Wagner Coaltech LLC; Walter Scott Refined Coal LLC; Winyah

Refined Coal LLC; and Williams Refined Coal LLC (collectively, "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      This is a civil action for infringement of United States patent No. RE47,980 (the "RE'980 Patent" or "patent-in-suit") arising under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*

2.      Mercury, a potent neurotoxin, is naturally present in coal.  Burning coal releases mercury into the air, where it can persist in the environment and have serious and long-lasting public health effects.  The RE'980 Patent discloses the pioneering invention of Dr. Bernhard Vosteen for efficiently removing mercury from the emitted flue gas of coal-fired plants.

3.      Dr. Vosteen discovered that—contrary to then-conventional wisdom in the industry—introducing bromine during coal combustion causes a high-temperature reaction that is highly effective at oxidizing and removing mercury.  The energy industry had been waiting for exactly the results Dr. Vosteen's process could deliver.  Defendants adopted his bromine-mediated reaction to bring down their mercury emissions, hitting regulatory benchmarks years earlier than government agencies and industry experts had thought technologically possible.

4.      Defendants received billions of taxpayer dollars for implementing their particular, branded version of Dr. Vosteen's patented process.  Arthur J. Gallagher & Co., a global insurance company, created numerous new companies to commercialize the bromine process, which it called the Chem-Mod Solution, at coal plants across the country.  Despite that extensive use, none of the Defendants has compensated Dr. Vosteen for the unlicensed use of his patented technology.  In particular, Gallagher and Chem-Mod were specifically warned that the Chem-Mod Solution infringed the RE'980 Patent, but they continued to willfully infringe anyway.

2

## THE PARTIES

5.      Plaintiff Bromerc Ltd., is a Hong Kong corporation with its principal place of business at 12/F., Elite Centre, 22 Hung To Road, Kwun Tong, Kowloon, Hong Kong.

6.      Plaintiff Mercex Ltd., is a UK corporation with its principal place of business at Solar House, 282 Chase Road, London N14 6NZ, England.

7.      Defendants AJG Iowa Refined Coal LLC; Brandon Shores Coaltech LLC; Canadys Refined Coal LLC; Cope Refined Coal LLC; Coronado Refined Coal LLC; Cross Refined Coal LLC; George Neal North Refined Coal LLC; George Neal Refined Coal LLC; Harrison Refined Coal LLC; Hastings Refined Coal LLC; Jeffries Refined Coal LLC; Joppa Refined Coal LLC; Louisa Refined Coal LLC; Mansfield Refined Coal LLC; Pleasants Refined Coal LLC; Thomas Hill Refined Coal LLC; USA Refined Coal LLC; Wagner Coaltech LLC; Walter Scott Refined Coal LLC; Winyah Refined Coal LLC; and Williams Refined Coal LLC are, collectively, "Gallagher Refined Coal LLC Defendants."

8.      Defendant Arthur J. Gallagher & Co. is a Delaware corporation with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

9.      Defendant Chem-Mod LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

10.     Defendant AJG Iowa Refined Coal LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

11.     Defendant Brandon Shores Coaltech LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

12.     Defendant Canadys Refined Coal LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

3

13.     Defendant Cope Refined Coal LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

14.     Defendant Coronado Refined Coal LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

15.     Defendant Cross Refined Coal LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

16.     Defendant George Neal North Refined Coal LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

17.     Defendant George Neal Refined Coal LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

18.     Defendant Harrison Refined Coal LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

19.     Defendant Hastings Refined Coal LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

20.     Defendant Jeffries Refined Coal LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

21.     Defendant Joppa Refined Coal LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

22.     Defendant Louisa Refined Coal LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

23.     Defendant Mansfield Refined Coal LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

24.     Defendant Pleasants Refined Coal LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

25.     Defendant Thomas Hill Refined Coal LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

26.     Defendant USA Refined Coal LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

27.     Defendant Wagner Coaltech LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

28.     Defendant Walter Scott Refined Coal LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

29.     Defendant Winyah Refined Coal LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

30.     Defendant Williams Refined Coal LLC is a Delaware limited liability company with its principal place of business at 2850 Golf Road, Suite 1000, Rolling Meadows, IL 60008.

## JURISDICTION AND VENUE

31.     Plaintiffs incorporate by reference paragraphs 1–30.

32.     This action arises under the patent laws of the United States, including 35 U.S.C. §§ 271 et seq.  The jurisdiction of this Court over the subject matter of this action is proper under 28 U.S.C. §§ 1331 and 1338(a).

33. Venue is proper in this district pursuant to 28 U.S.C. § 1400(b) because all Defendants are entities organized under the laws of Delaware and therefore all Defendants reside in this District for purposes of venue under 28 U.S.C. § 1400(b).

34. This Court has personal jurisdiction over Defendants because all Defendants are entities organized under the laws of Delaware.

## BACKGROUND OF THE INVENTION

35. Plaintiffs incorporate by reference paragraphs 1–34.

### A. Dr. Vosteen's Background

36. Dr. Bernhard W. Vosteen is a professor and doctor of engineering with over fifty years of experience in industrial and academic research and development regarding thermal processes and environmental protection.  (Ex. 2 ('358 Reexamination File History, Declaration of Prof. Dr.-Ing. Bernhard W. Vosteen (July 3, 2012)) ¶¶ 1–6.)  Dr. Vosteen has devoted his career to protecting the environment and improving public health by developing technology to reduce harmful emissions from industrial processes, including hazardous waste disposal and coal combustion.

37. From 1995 to 2008, Dr. Vosteen taught classes on waste management and combustion at the Institute of Energy Process Engineering and Fuel Technology at the Technical University of Clausthal, Germany.  (Ex. 2 ¶ 3.)  From 1998 to 2007, Dr. Vosteen also taught classes on wastewater treatment, waste management, and combustion and flue gas cleaning at the Institute of Environmental Protection at Martin Luther University Halle-Wittenberg, Germany. (*Id.*)

38. From 1990 to 2001, Dr. Vosteen worked at Bayer AG ("Bayer"), a multinational chemical and pharmaceutical company.  While at Bayer, Dr. Vosteen served as a process engineer focused on hazardous waste incineration.  During this time, Dr. Vosteen engaged in

research and development in collaboration with Bayer and the universities at which he taught. Dr. Vosteen also mentored several doctoral students who assisted with his research.

39.     Around January 2000, Bayer came to Dr. Vosteen with an urgent problem: Bayer was experiencing high mercury emissions from its waste incinerators, and there was no available method to reduce these toxic emissions efficiently.  From then on, Dr. Vosteen devoted his time to solving the mercury-emissions problem.  Working with some of his doctoral students and an academic research partner, Dr. Vosteen developed a process that revolutionized mercury removal, using a bromine reaction to oxidize mercury at high temperatures.

40.     After Dr. Vosteen developed his mercury removal process, in recognition of his pioneering industrial and academic research endeavors, Dr. Vosteen was awarded the academic title of Honorary Professor by the Technical University of Clausthal in 2001.  (Ex. 2 ¶ 4.)

**B.  The Mercury Emissions Problem**

41.     At the time Dr. Vosteen made his groundbreaking discovery, mercury pollution from industrial processes was widely recognized as a serious environmental and public health problem.  By far the biggest source of mercury pollution was fossil fuel combustion—in particular combustion of coal.  By one estimate, in 2000, fossil fuel combustion accounted for as much as two-thirds of global mercury emissions, with coal combustion responsible for emissions one to two orders of magnitude higher than oil, depending on the country.  (Ex. 3 (Elisabeth G. Pacyna et al., *Global Anthropogenic Mercury Emission Inventory for 2000*, 40 Atmospheric Env't 4048 (2006)) at 4052–53.)  In the U.S., in 1998, one-third of all human-generated mercury emissions—51 tons of mercury annually—came from coal-fired plants.  (Ex. 4 (*Press Release: EPA Issues New Report on Air Toxics from Power Plants*, EPA (Feb. 25, 1998), https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/ d585da4fccdfc432852565b6006ba425.html).)

42.     The effects of mercury pollution are severe.  Mercury is a neurotoxin that can impact vision, speech, hearing, and motor skills.  (*See* Ex. 5 (*Health Effects of Exposure to Mercury*, EPA, https://www.epa.gov/mercury/health-effects-exposures-mercury).)   Infants are particularly vulnerable to mercury poisoning, and exposure to mercury in the womb can have permanent neurological and developmental effects.  (*See id.*; Ex. 6 (*EPA Decides Mercury Emissions from Power Plants Must Be Reduced*, EPA (Dec. 14, 2000), https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/ cd30963685856f30852569b5005ee740.html.)

43.     In a 1998 report to Congress, the EPA concluded that mercury was the "air toxic [sic] of greatest public health concern from utilities." (Ex. 4.)  At the same time, the EPA found that there were "no feasible technologies currently available that could effectively reduce mercury from coal-fired facilities." (*Id.*)  By the end of 2000, the "EPA determined mercury emissions from power plants pose significant hazards to public health and must be reduced." (Ex. 6.)

44.     In 2012, the EPA promulgated the Mercury and Air Toxics Standards (MATS), and in 2015, MATS began to take effect.  (*See* Ex. 7 (Joseph Goffman, *Timeline: Mercury and Air Toxics Standards*, Env't & Energy L. Program, Harvard L. Sch. (March 13, 2019), https://eelp.law.harvard.edu/chronology-mercury-and-air-toxics-standards); Ex. 8 (Mercury and Air Toxics Standards (MATS) Completion of Electronic Reporting Requirements, 81 Fed. Reg. 67062 (2016)) at 67063.)  In the MATS final rule in 2012, the EPA projected that the mercury emissions limits set by MATS would force reduction of power plants' mercury emissions by 90%.  (*See* Ex. 9 (*National Emission Standards for Hazardous Air Pollutants from Coal- and Oil-Fired Electric Utility Steam Generating Units and Standards of Performance for Fossil-*

*Fuel-Fired Electric Utility, Industrial-Commercial-Institutional, and Small Industrial-Commercial-Institutional Steam Generating Units*, 77 Fed. Reg. 9304 (2012)) at 9306.)

45.     Congress independently recognized the importance of addressing the problem of coal plants' mercury emissions.  In 2004, Congress, through the American Jobs Creation Act, amended Section 45 of the tax code to provide for a tax credit aimed at encouraging the coal industry to adopt mercury-control technology voluntarily, years before the EPA's regulations made such measures mandatory.  This amendment provided tax credits for producers of "refined coal."  "Refined coal" was defined as coal that, when burned for production of steam, achieves "a reduction of at least 20 percent of the emissions of nitrogen oxide and at least 40 percent of the emissions of either sulfur dioxide or mercury."  (Ex. 50 (26 U.S.C. § 45) at § 45(c)(7).)  The Section 45 refined coal tax credits ended on December 31, 2021.

46.     Section 45 tax credits were calculated per ton of refined coal sold, according to a formula that accounted for inflation and fluctuations in fuel prices.  (*Id.* at § 45(b)(2), (e)(8).)  In the final year of the program, the value of the Section 45 refined coal tax credit was $7.384 per ton.  (Ex. 10 (*Credit for Renewable Electricity Production, Refined Coal Production, and Indian Coal Production, and Publication of Inflation Adjustment Factors and Reference Prices for Calendar Year 2021*, 86 Fed. Reg. 22300 (2021)) at 22301.)  Between 2010 and 2020, approximately $8.9 billion of Section 45 tax credits were claimed by the coal-burning industry, of which the named Defendants are a part.  (Ex. 11 (Sherrod Brown, Elizabeth Warren & Sheldon Whitehouse, *Refined Coal Production Tax Credit: Coordinated Agency Review Could Help Ensure the Credit Achieves Its Intended Purpose*, U.S. Gov. Accountability Off. (Dec. 15, 2021)) at 6.)

47.     While the EPA was setting regulatory thresholds on mercury emissions, and Congress was providing economic incentives to meet those thresholds, the U.S. Department of Energy worked to fund the research necessary to find a way to make these emissions-reduction goals technologically possible.  From 1998 to 2005, the DOE spent over $60 million on mercury research and development.  (Ex. 12 (Thomas J. Feeley, III, *DOE/NETL's Mercury Control Technology R&D Program Review*, Nat'l Energy Tech. Laboratory (July 12–14, 2005)) at 9.) The goal of the DOE's program was to develop technologies that could reduce mercury emissions on a commercial scale at a higher efficiency and lower cost than available technologies.  Indeed, the DOE recognized that solving the mercury emissions problem was critical for practical continued use of the United States's vast coal reserves—on which much of the country's energy infrastructure relied.  By 2007, the DOE aimed to have technologies ready for commercial demonstration that could achieve 50–70% mercury-emissions reductions, at a cost of $45,000 per pound of mercury removed.  (Ex. 12 at 19.)  By 2010, DOE hoped to achieve over 90% mercury-emissions reductions, at a cost of $30,000 per pound of mercury removed. (*Id.*)  However, at the time the DOE began its research initiative, these were lofty aspirations which no existing technology could achieve.

## C.  The State of the Art

48.     When Bayer first came to Dr. Vosteen for help reducing mercury emissions, the only existing solutions were expensive and inefficient.  Indeed, in 2003, the DOE's baseline cost estimates for reducing mercury emissions were $50,000–$70,000 per pound of mercury removal. (*Id.* at 11.)

49.     Before Dr. Vosteen developed his patented bromine reaction, the existing mercury-emissions solutions fell into two primary categories: sorbent injection and chlorine addition.

50.     The first available solution was injection of a sorbent into the flue gas stream. The sorbent particles could adsorb mercury, and the adsorbed mercury could then be filtered out of the gas stream.  The most prominent sorbent in use at the time was activated carbon. (*See* Ex. 13 (R. Chang, *Status of Mercury Control Technologies: Activated Carbon Injection and Boiler Chemical Additives*, Elec. Power Rsch. Inst. (March 2006)) at 2-1.)

51.     However, activated carbon injection exhibited a variety of problems.  Sorbent injection is more effective at lower temperatures.  (*See* Ex. 49 (Ramsay Change et al., *Mercury Emission Control Technologies: An EPRI Synopsis* (Nov. 1, 1995)) at 5.)  Because waste incinerators and coal plants both operate at very high temperatures, the temperature of the exhaust gas had to be lowered to improve the efficacy of mercury removal using sorbent injection.  (*Id.*)  Lowering exhaust temperatures required either the injection of large amounts of water, which increases cost and corrosion of plant materials, or the implementation of other, more costly temperature-control mechanisms.  (*Id.*)  In addition, improving the efficacy of activated carbon injection required high volumes of sorbent, which also increased costs, as well as increased corrosion of power-plant components and equipment.  (*Cf.* Ex. 13 at 2-9; Ex. 14 (Steven A. Benson et al., Energy & Env't Rsch. Ctr., *Large-Scale Mercury Control Technology Testing for Lignite-Fired Utilities—Oxidation Systems for Wet FGD: Final Report* (March 2007)) at 34.)  More importantly, the effectiveness of activated carbon injection decreases in the presence of sulfur, which occurs naturally in coal.  (Ex. 13 at 2-11.)

52.     The second available solution involved addition of chlorine compounds.  Chlorine reacts with elemental mercury and converts it to oxidized mercury, which can then be removed from the gas stream in cleanup steps.

53.     Like sorbent injection, chlorine addition had several drawbacks and limitations. First, chlorine is highly corrosive, especially as compared to bromine, creating expense and concerns about degradation of plant machinery over time.   Moreover, the effectiveness of chlorine to reduce coal-plant mercury emissions, even at high concentrations, was limited.   In 2005 testing performed in collaboration with the DOE, chlorine compounds could not achieve 55% mercury reduction, let alone the 70% and 90% reduction benchmarks that the DOE, and later the EPA, identified as necessary.  (*See* Ex. 14 at xv–xvii, 30–34.)

**D.  Dr. Vosteen's Discovery**

54.     After Bayer came to Dr. Vosteen for help solving their mercury emissions problem, Dr. Vosteen began performing experiments co-combusting mercury and chlorine.  For his experiments, Dr. Vosteen would inject mercury into a furnace containing chlorinated waste and measure the amount of elemental mercury remaining after the co-combustion.[1]

55.     In June 2000, Dr. Vosteen and his doctoral student injected mercury into the furnace as usual but were surprised to see that almost no elemental mercury was measured in the exhaust.  Dr. Vosteen realized that the day's chlorinated waste also included significant amounts of bromine.  After reviewing his experimental results, Dr. Vosteen made a surprising discovery: contrary to the conventional teachings in the field, bromine was significantly more effective than chlorine at oxidizing mercury, and thus, at reducing mercury emissions.

56.     Over the next several years, Dr. Vosteen focused his research on bromine, working to understand and refine the bromine reaction for mercury removal.   Dr. Vosteen performed experiments to optimize his bromine reaction in both hazardous-waste plants and coal-combustion plants.

---

[1] Generally, oxidized mercury can be removed from the gas stream in subsequent cleanup steps, while elemental mercury is not removed during cleanup and is emitted as a toxic environmental pollutant.

57.    In July 2002, Dr. Vosteen and his collaborators filed for German and U.S. patents for the mercury-removal solution they had discovered and perfected: reaction of bromine with mercury, at high temperatures and in the presence of a sulfur compound.  Dr. Vosteen subsequently received patents for his groundbreaking discovery in many additional international jurisdictions.

58.    Dr. Vosteen's serendipitous discovery took him, his collaborators, and the field as a whole by surprise.  Before Dr. Vosteen's invention, the conventional wisdom in the field was that chlorine—which belongs to the same chemical group (halogens) as bromine—was the preferred chemical treatment for mercury removal, albeit one of limited effectiveness, because chlorine was the cheapest halogen.  However, Dr. Vosteen's early experiments found that, contrary to the prevailing scientific teachings, bromine was about twenty-five times more effective than chlorine at oxidizing, and thus removing, mercury.  (Ex. 1 (RE47,980) at 11:9–10.)

59.    The prior art taught away from every aspect of Dr. Vosteen's process.  The prior art presumed that all halogens—and specifically chlorine, bromine, and iodine—were equally effective at oxidizing mercury, and thus chlorine was preferred for reasons of cost.  The prior art also taught that lower temperatures were preferred or even required for the halogen-mercury reaction.  In addition, the prior art taught that sulfur inhibited the reaction.  (*See id.* at 4:9–13.)

60.    For example, before Dr. Vosteen's invention, the state of the art at the time would have predicted less than 12% mercury removal at Dr. Vosteen's reaction conditions, whereas Dr. Vosteen was able to demonstrate over 99% mercury removal.  (Ex. 2 ¶¶ 11–12; *see also* Ex. 1 at 8:42–10:27.)

61.    During a reexamination of Dr. Vosteen's initial patent, the Patent Trial and Appeal Board recognized the unexpected nature of Dr. Vosteen's results: "We have not been

directed to any teachings in . . . [the] cited prior art in this appeal, which would have led one of ordinary skill in the art to expect more than 80% removal at [high temperatures]." (Ex. 15 ('358 Reexamination File History, Decision on Request for Rehearing (Apr. 9, 2015)) at 9.) Nor had the Examiner "pointed to any disclosure in the prior art that would have predicted that bromine is more effective than chlorine in removing mercury in the presence of sulfur dioxide" at Dr. Vosteen's high temperatures. (*Id.* at 11.)

62.    Later testing performed under a license for Dr. Vosteen's process found the contrast between bromine and chlorine to be even greater than Dr. Vosteen's initial results had suggested, with bromine proving to be over one hundred times more effective than chlorine. (Ex. 16 (RE'980 Reissue File History, Declaration of Prof. Dr.-Ing. Bernhard W. Vosteen (Jan. 4, 2019)) ¶ 11.) Dr. Vosteen also found that bromine worked effectively at high temperatures, and in the presence of sulfur, which occurs naturally in coal. (Ex. 1 at 3:17–4:42.)

63.    Testing performed in coal plants in 2005 in collaboration with the DOE confirmed these extraordinary results. These tests found that chlorine compounds failed to achieve even 55% mercury removal, while bromine compounds achieved averages of 86% mercury removal. (Ex. 14 at xv–xvii, 30–34, 66–68.) Moreover, bromine treatment achieved ***higher*** mercury reductions at ***less than half the cost*** per pound of mercury removal of the second-most effective mercury-control technology. (*Id.* at xvi–xviii.)

64.    In fact, Dr. Vosteen's groundbreaking patented process blew past the DOE's long-term goals for mercury-capture technology, years before the DOE had predicted meeting those goals would be possible. The DOE's ultimate aim was to develop technology that could achieve 90% mercury removal, at a cost of $30,000 per pound of mercury removed, by 2010. (Ex. 12 at 19.) Full-scale tests of Dr. Vosteen's bromine process performed in coal plants for the

DOE's research program *in 2005* achieved *over* 90% mercury removal, and researchers estimated that this process could be implemented at a cost of under $10,000 per pound of mercury removed.  (Ex. 14 at 66–68, 93.)

65.     In light of these extraordinary results, in 2006 one of the largest utility companies in the United States licensed Dr. Vosteen's patented mercury-removal process.

66.     Dr. Vosteen's bromine process subsequently became the state of the art, prompting a revolution in mercury-pollution control.  One commentator in 2015 described bromine as "an environmental savior because of its ability to reduce mercury emissions from the smokestacks of coal-fired power plants."  (Ex. 17 (Marc S. Reisch, *Bromine Comes to the Rescue for Mercury Power Plant Emissions*, Chem. & Eng'g News (March 16, 2015), https://cen.acs.org/articles/93/i11/Bromine-Comes-Rescue-Mercury-Power.html).)

67.     Thanks in large part to Dr. Vosteen's patented technology, coal plants were able to decrease their mercury emissions dramatically and meet the EPA's MATS regulations.  By 2021, mercury emissions from coal plants "were 90 percent lower than pre-MATS levels."  (Ex. 18 (*Fact Sheet: EPA's Final Rule to Strengthen and Update the Mercury and Air Toxics Standards for Power Plants*, EPA (2024), https://www.epa.gov/system/files/documents/2024-04/fact-sheet_mats-rtr-final_rule_2024.pdf) at 1.)

68.     As the Director of Research and Technology Management at Southern Company Services, one of the largest utilities in the U.S. and an early adopter of Dr. Vosteen's technology, stated in 2012:

> Professor Vosteen has been instrumental in the commercial development of bromine injection technology.  He is more than the inventor of the approach. Professor Vosteen has mentored and guided its development by working alongside a number of testing contractors, research institutes, technology vendors and utility engineers demonstrating the merits of the technology to reduce

> mercury emissions from coal-fired power plants . . . . Professor
> Vosteen has made an extraordinary impact to the utility
> community and the environmental community at large by sharing
> his extensive technical understanding regarding bromine injection
> technology. The result of his efforts will one day include a major
> reduction of world-wide mercury emissions.

(Ex. 19 (Dr. Mark Simpson Berry, Director, Rsch. & Tech. Mgmt., So. Co. Servs., A Cover Letter on Behalf of Professor Bernhard Wilhelm Vosteen Highlighting His Life-Long Achievements in the Area of Mercury Research (Dec. 15, 2012)) at 2.)

## THE PATENT-IN-SUIT

69.     Plaintiffs incorporate by reference paragraphs 1–68.

70.     The RE'980 Patent, entitled "Process for Removing Mercury from Flue Gases," was duly and legally reissued by the United States Patent and Trademark Office on May 12, 2020. The RE'980 Patent is a reissue of US 6,878,358 (the "'358 Patent"), which was published on April 12, 2005. A copy of the RE'980 Patent is attached hereto as Exhibit 1. A copy of the '358 Patent is attached hereto as Exhibit 20.

71.     The inventors of the RE'980 Patent are Dr. Bernhard Vosteen and his research team: Rico Kanefke, Ewa Kanefke, Michael Nolte, Andrea Schnitzer, Andreas Pohontsch, Claus Mueller, Joachim Beyer, Theodore-Gerhard Bonkhofer, Olaf Fleth, and Heinz Koeser.

72.     The RE'980 Patent is assigned to Bromerc Ltd. (*See* Ex. 21 (Assignment to Bromerc).) Bromerc is the exclusive owner of the RE'980 Patent. Mercex, Ltd. is the exclusive licensee of the patent. Bromerc and Mercex have the right to bring this suit to recover damages for any current or past infringement of the RE'980 Patent.

73.     The RE'980 Patent discloses Dr. Vosteen's novel process for removing mercury from the exhaust, or flue gas, of high-temperature plants, including coal-fired power plants and waste-incineration plants. This process involves reacting the elemental mercury in the flue gas

16

with a bromine compound at a high temperature and in the presence of a sulfur compound to produce oxidized mercury, which can then be removed from the flue gas in subsequent cleanup steps using dry sorbents and scrubbers.

74.    For example, claim 19 of the RE'980 Patent recites one implementation of Dr. Vosteen's inventive process applicable to coal-fired power plants:

> Process for removing mercury from mercury-containing flue gas of a furnace within which a combustion or incineration of coal containing sulfur is carried out, comprising the steps of
>
> feeding bromine to the mercury-containing flue gas, the temperature during the first contact of the bromine with the mercury-containing flue gas being at least 800°C, and the combustion or incineration being carried out in the presence of a sulphur compound such that a gas phase reaction takes place between the bromine and the mercury so as to produce a bromine-contacted mercury-containing flue gas wherein the mercury is essentially completely oxidized;
>
> wherein said bromine is selected from the group consisting of bromine, a bromine compound, a mixture of bromine compounds and a mixture of bromine and a bromine compound or compounds, and wherein the feeding step feeds bromine to the furnace or to the flue gas of the furnace in a plant section downstream of the furnace, or to both the furnace and the flue gas; and
>
> subjecting the bromine-contacted mercury-containing flue gas to a cleanup for removing oxidized mercury whereby mercury is substantially removed from the bromine-contacted mercury-containing flue gas, wherein the cleanup includes at least one of a wet scrubbing stage and a dry cleanup stage, the dry cleanup stage comprising at least one sorbent.

(Ex. 1 at 14:58–15:17.)

75.    As another example, dependent claim 20 of the RE'980 further recites: "Process according to claim 19, wherein the feeding step comprises mixing the bromine with the coal to be combusted in the furnace, or upstream of the furnace." (Ex. 1 at 15:18–20.)

76.    The RE'980 Patent explains how, before Dr. Vosteen's inventive process, coal-fired power stations needed an efficient process to remove mercury given its high toxicity. However, existing methods were found to be not sufficiently efficient or effective, and required high additional capital and operating costs.  Dr. Vosteen's inventive process overcame such problems in the field with a novel and innovative solution that the prior art taught away from—feeding bromine to mercury-containing flue gas at high temperatures and in the presence of a sulfur compound.  The mercury is essentially completely oxidized, which allows it to be readily removed using dry sorbents and scrubbers.

77.    For example, the RE'980 Patent explains that "[p]revious techniques for reduction are not sufficiently effective and, owing to their sometimes high additional capital costs and the additional consumption of operating media are relatively expensive."  (Ex. 1 at 1:58–61.)

78.    By contrast, the RE'980 Patent explains that Dr. Vosteen's effective, inexpensive process has myriad benefits over the prior art.

79.    For example, the RE'980 Patent teaches that Dr. Vosteen's process can be implemented broadly across different types of plants:

> ***The advantageous process is advantageous precisely because it is applicable to various types of high-temperature plants and to high-temperature processes of varying order of magnitude.***  This encompasses plants having a flue gas volumetric flow rate of only $15 \cdot 10^3$ m$^3$ S.T.P. db/h, for example for sewage sludge incineration, or of $50 \cdot 10^3$ m$^3$ S.T.P. db/h, for example in hazardous waste incineration plants, or of $150 \cdot 10^3$ m$^3$ S.T.P. db/h, for example in domestic waste incineration, and also encompasses large power stations having, for example, $2$–$3 \cdot 10^6$ m$^3$ S.T.P. db/h.

(Ex. 1 at 2:57–67 (emphasis added).)

80. In particular, the RE'980 Patent discloses the advantages of Dr. Vosteen's novel bromine reaction as compared to a chlorine reaction, which was at the time a prevalent but suboptimal method of mercury removal.

81. For example, Dr. Vosteen discovered that bromine is much more effective than chlorine at oxidizing mercury:

> Mercury can in principle also be oxidized by chlorine compounds or iodine compounds. However, it has been found that ***bromine compounds oxidize mercury more effectively*** under the given conditions of high-temperature processes, such as temperature and in particular also at a high sulphur dioxide content (see above) ***than chlorine compounds.***

(Ex. 1 at 4:61–67 (emphasis added).)

82. The RE'980 Patent further discloses that Dr. Vosteen's bromine reaction performs better in the presence of sulfur dioxide than a chlorine reaction:

> Herein is a particular advantage of the present process, since the oxidation of mercury by adding bromine compounds is found to be substantially insensitive to an excess of sulphur dioxide, unlike that due to the addition of chlorine compounds.

(Ex. 1 at 4:9–13.)

83. The RE'980 Patent also discloses that Dr. Vosteen's bromine reaction is superior to a chlorine reaction in plants equipped only with dry emission control systems:

> The use of the process is of interest in particular for those high-temperature plants which do not have a wet flue gas emission control system, but solely have a dry emission control system having a mercury sorption stage. ***Mercury bromide $HgBr_2$ adsorbs more strongly to dry sorbents than mercury chloride $HgCl_2$.*** For example, mercury adsorption intensifies on the fly ash of ESPs.

(Ex. 1 at 5:47–54 (emphasis added).)

84.     In addition to removing mercury more effectively than existing solutions, Dr. Vosteen's invention also represented a substantial step forward over the prior art because of its affordability:

> Furthermore, the process should not require extensive refitting of the high-temperature plants and should require the smallest possible amount of additional operating media, so that *the process can be implemented and operated inexpensively*.
>
> * * *
>
> It is not critical for the inventive process in what form the bromine supplied is present. It is possible to use free or organically bound or inorganically bound bromine. The bromine or the bromine compounds can be fed individually or in a mixture. Particularly preferably, an aqueous solution of hydrogen bromide or an alkali metal bromide, in particular sodium bromide, or an aqueous solution of the alkali metal bromide is used. *This embodiment makes the process of particular economic interest, since the costs for additional operating media can be kept low*.

(Ex. 1 at 2:4–8, 3:1–10 (emphasis added).)

85.     The inventive concept in the RE'980 Patent thus represented a significant improvement in the removal of mercury from the flue gases of high-temperature plants, including coal-fired power plants. At the time of Dr. Vosteen's invention, the reaction taught by the RE'980 Patent—addition of bromine at high temperatures and in the presence of a sulfur compound—would not have been routine or conventional. In fact, the prior art and conventional wisdom of the field taught away from Dr. Vosteen's inventive process.

86.     For example, during the reissue proceedings of the RE'980 Patent, Dr. Monika Greczmiel—co-inventor of a key piece of prior art relied upon by the examiner in the reexamination proceedings of the '358 Patent—testified that a person of ordinary skill in the art, in light of her patent and other prior art relied upon by the examiner, would have expected that Dr. Vosteen's high-temperature reaction would ***not*** work:

> I understand that the teaching of our disclosure from CA '529 is being used to suggest the effectiveness of bromine in being contacted with mercury-containing flue gases at temperatures greater than 800°C.  Given my experience in the field, and understanding of the teachings from CA '529, this teaching would not suggest the effectiveness of bromine at temperatures of first contact in excess of 800°C.  Rather, *the expectation would be that operating at such high temperatures would be non-functional* because of the excessive temperatures involved.

(Ex. 22 (RE'980 Reissue File History, Declaration of Monika Greczmiel (June 17, 2016)) ¶¶ 10–11 (emphasis added).)

87.    During reexamination of the '358 Patent, the Patent Trial and Appeal Board recognized that nothing in the prior art would have predicted the effectiveness of Dr. Vosteen's reaction: "[T]he data clearly establishes that bromine is more effective th[a]n chlorine.  The Examiner has not pointed to any disclosure in the prior art that would have predicted that bromine is more effective than chlorine in removing mercury in the presence of sulfur dioxide at 1150–1050°C."  (Ex. 15 at 11.)

88.    The Notice of Allowance for the RE'980 Patent further emphasized the unexpected nature of Dr. Vosteen's results: "Moreover, as stated in the [PTAB's] Decision, the data clearly establishes that bromine is more effective th[a]n chlorine and the prior art does not teach that bromine is more effective than chlorine in removing mercury in the presence of sulfur dioxide.  Accordingly, the instant claims are patentable over the cited prior art." (Ex. 23 (RE'980 Reissue File History, Notice of Allowance (Feb. 12, 2020)) at 2.)

## DEFENDANTS' INFRINGING ACTIVITIES

89.    Plaintiffs incorporate by reference paragraphs 1–88.

### A.  The Accused Chem-Mod Process

90.    In or around 2004, Chem-Mod LLC, under the direction and control of Arthur J. Gallagher & Co., began testing the Chem-Mod Solution, its particular, branded process for

removing mercury from the flue gases of coal-fired power plants that mirrors Dr. Vosteen's inventive process. (*See* Ex. 24 (Chem-Mod LLC Operating Agreement) at 1, 6–8).

91.    Full-scale commercial testing of the Chem-Mod process was performed in 2005 (*see* Ex. 25 (Chem-Mod.com (captured Oct. 23, 2014)) at 10), and the Chem-Mod process was thereafter marketed commercially and implemented in power plants across the United States until the end of 2021. (*See* Ex. 26 (Annual Report, Arthur J. Gallagher & Co. (2022)) at 36, 52, 99–100.)

92.    The Chem-Mod process comprises mixing coal with two branded reagents— MerSorb and S-Sorb—to make what Defendants refer to as "refined coal." (*See* Ex. 27 (Chem-Mod, *Production of Refined Coal Using the Chem-Mod Process*) at 2.) This refined coal is then combusted in a coal-fired power plant in order to reduce mercury emissions from the plant. (*See id.* at 2.)

93.    The Chem-Mod process feeds bromine to the mercury-containing flue gas of a coal plant, by mixing the bromine with the coal to be combusted in the furnace. Bromine "is added to the coal as a salt solution, in this case 52% $CaBr_2$ in water. The Chem-Mod trade name for this additive is MerSorb." (*Id.*) MerSorb is mixed with the coal prior to combustion, "typically . . . when the coal is bunkered for firing in the steam generator." (*Id.*)

94.    The Chem-Mod process includes temperatures during the first contact of the bromine and the mercury-containing flue gas of at least 800°C. "When coal is burned Mercury (Hg) is released from the mineral matrix in elemental form ($Hg^0$)" into the flue gas. (*Id.*) The bromine that was added to the refined coal in the form of MerSorb contacts this mercury-containing flue gas upon combustion of the refined coal. (*Id.*) The temperatures of coal-plant furnaces, where this combustion takes place, exceed 800° C. (*See, e.g.*, Ex. 28 (Shoaib

Mehmood, Bale V. Reddy & Marc A. Rosen, *Analysis of Emissions and Furnace Exit Gas Temperature for a Biomass Co-firing Coal Power Generation System*, 8 Rsch. J. Env't Scis. 274 (2014)) at 280 Fig.2; Ex. 29 (Int'l Energy Agency, *Pulverised Coal Combustion (PCC)* (Jan. 20, 2018)) at 1.)

95.    The combustion of refined coal in the Chem-Mod process takes place in the presence of a sulfur compound.  Coal naturally contains sulfur compounds.  (*See, e.g.*, Ex. 1 at 3:67–4:3.)  Upon combustion of the coal, this sulfur is released into the flue gas and emitted as sulfur dioxide.  (*See* Ex. 30 (Meng Wu et al., *Method of Identifying Total Sulfur Content in Coal: Geochemical and Geophysical Logging Data from the Upper Paleozoic in North China*, 7 ACS Omega 45045 (2022)) at 45045.)

96.    Combustion of refined coal in the Chem-Mod process results in a gas phase reaction between the bromine in MerSorb and the mercury-containing flue gas wherein the mercury is essentially completely oxidized.  "When refined coal is burned the MerSorb is thermally decomposed in the furnace and the Bromine (Br) reacts with $Hg^0$ to produce the oxidized form ($Hg^{2+}$)."  (Ex. 27 at 2.)

97.    The Chem-Mod process further includes subjecting the bromine-contacted mercury-containing flue gas to a cleanup to remove the oxidized mercury.  The Chem-Mod process requires a dry cleanup stage comprising a sorbent and may also include a wet scrubbing stage.  S-Sorb, which is added to the refined coal as part of the Chem-Mod process, is "a dry powder sorbent . . . made from raw feed, product and by-product materials from the cement industry."  (*Id.*)  The oxidized mercury, formed through the reaction of MerSorb and elemental mercury in the flue gas, "is very reactive and can be removed from the flue gases in a number of

ways.  It can react with solid particles such as the S-Sorb.  It also can be absorbed on powdered activated carbon (PAC) or in wet scrubber liquor." (*Id.*)

98.    Implementation of the Chem-Mod process substantially removes mercury from the coal plant's flue gas.  The Chem-Mod process "effectively reduces mercury air emissions by up to 98 percent." (Ex. 25 at 3.)  Early full-scale commercial testing of the Chem-Mod process conducted, at the direction of Chem-Mod, by the Energy and Environment Research Center at the University of North Dakota showed mercury-removal rates between 86% and 98%. (*Id.* at 10.)  Coal plants that later implemented the Chem-Mod process regularly reported significant mercury-emissions reductions.

99.    In marketing the Chem-Mod process, Chem-Mod touted the very same benefits and improvements that Dr. Vosteen disclosed in the RE'980 Patent.  For example, Chem-Mod advertised that its process had been proven to reduce mercury emissions "at a fraction of the capital cost commitments other air emissions control technologies require" and was "less costly to implement than other existing mercury and sulfur control technologies." (*Id.* at 6.)  Further, in line with Dr. Vosteen's teaching that use of his inventive process would "not require extensive refitting of the high-temperature plants and should require the smallest possible amount of additional operating media" (Ex. 1 at 2:4–8), Chem-Mod emphasized that the Chem-Mod process "carries minimal impact on plant operations and should not result in adverse maintenance costs" and that "plants currently using sorbents during their coal combustion process may already have the required equipment installed at their facilities." (Ex. 25 at 16.)  Like Dr. Vosteen, Chem-Mod noted that the bromine process could be "used in a variety of different boiler types and units burning several different coal types, as well as with a range of

pollution control equipment including scrubbers, Selective Catalytic Reduction (SCR) units, bag houses and Electrostatic Precipitators (ESP)." (*Id.* at 8.)

**B. Defendants' Business Model**

100.    Where Dr. Vosteen, the EPA, and so many others saw a crucial public health issue, Defendant Arthur J. Gallagher & Co. saw a lucrative business opportunity. Immediately after Congress created the Section 45 refined coal tax credits, Gallagher devised a multi-tiered business model to reap those tax credits by producing and selling refined coal.

101.    Less than one week after Congress passed the American Jobs Creation Act of 2004, which provided for Section 45 refined coal tax credits, Arthur J. Gallagher & Co., through various subsidiaries, created Chem-Mod LLC "for the purpose of developing, using and commercializing certain coal remediation technology." (Ex. 24 at 1.)

102.    Gallagher used Chem-Mod as an intermediary through which Gallagher controlled and licensed its particular, branded coal-refining process. Gallagher had "a 46.5% controlling interest in" and total operational control over Chem-Mod. (*See* Ex. 31 (Annual Report, Arthur J. Gallagher & Co. (2021)) at 35, 100 ("We are the manager (decision maker) of Chem-Mod LLC and therefore consolidate its operations into our consolidated financial statements.").)

103.    Chem-Mod's operations consisted of licensing the Chem-Mod process to various coal plants and coal-refining operations, selling the MerSorb and S-Sorb reagents to those plants, and providing technical and operational support for implementation of the Chem-Mod process. (*See id.* at 100.)

104.    In addition to Chem-Mod, Gallagher created a number of entities—the Gallagher Refined Coal LLCs, including at least the Gallagher Refined Coal LLC Defendants, *see* ¶ 7, *supra*—to facilitate its coal-refining operations and reap Section 45 tax credits. The Gallagher

Refined Coal LLCs acted as the agents and/or alter egos of Gallagher, and Gallagher, in cooperation with outside investors, entirely controlled the operations of these entities. Some Gallagher Refined Coal LLCs were owned entirely by Gallagher. For other Gallagher Refined Coal LLCs, Gallagher (using an arrangement duplicated by the rest of the coal-burning industry to structure their analogous refined-coal operations) sold shares of the LLCs to investors, based on the value of the Section 45 tax credits that investors could expect to receive. As a CERT corporate representative testified, CERT, a company that licensed the Chem-Mod process from Gallagher and mimicked Gallagher's business model, sold shares of its Refined Coal LLCs to investors based on the expected value of tax credits. (Ex. 32 (Transcript of Jury Trial, Volume III, *Midwest Energy Emissions Corp. v. Arthur J. Gallagher & Co.*, No. 19-cv-1334 (D. Del. Apr. 4, 2025) (D.I. 783)) at 857:24–858:2.)

105.    Each Gallagher Refined Coal LLC was associated with a different coal plant (hereinafter referred to as "Associated Coal Plants"). On information and belief, the following exemplary table represents the pairings between a subset of the Gallagher Refined Coal LLCs and their respective Associated Coal Plants:

| Refined Coal LLC | Associated Coal Plant | Location |
|---|---|---|
| Cope Refined Coal LLC | Cope Generating Station | Cope, South Carolina |
| Coronado Refined Coal LLC | Coronado Generating Station | Saint Johns, Arizona |
| George Neal North Refined Coal LLC | George Neal Station North | Sergeant Bluff, Iowa |
| George Neal Refined Coal LLC | George Neal Station South | Salix, Iowa |
| Hastings Refined Coal LLC | Whelan Energy Center | Hastings, Nebraska |
| Jeffries Refined Coal LLC | Muscatine Generating Station | Muscatine, Iowa |
| Joppa Refined Coal LLC | Joppa Steam Plant | Joppa, Illinois |
| Louisa Refined Coal LLC | Louisa Generating Station | Muscatine, Iowa |
| Thomas Hill Refined Coal LLC | Thomas Hill Energy Center | Clifton Hill, Missouri |
| Wagner Coaltech LLC | Herbert A. Wagner Generating Station | Anne Arundel County, Maryland |
| Walter Scott Refined Coal LLC | Council Bluffs Energy Center | Council Bluffs, Iowa |
| Williams Refined Coal LLC | Williams Generating Station | Goose Creek, South Carolina |

106.    Each Refined Coal LLC leased land from its Associated Coal Plant and built coal-refining facilities onsite at the plant. (*Cf.* Ex. 33 (Transcript of Jury Trial, Volume IV, *Midwest Energy Emissions Corp. v. Arthur J. Gallagher & Co.*, No. 19-cv-1334 (D. Del. Apr. 4, 2025) (D.I. 784)) at 958:6–960:5 (explaining the analogous operation of CERT Refined Coal LLCs).) The Refined Coal LLC would purchase raw coal from the Associated Coal Plant, treat the coal according to the Chem-Mod process, and sell the refined coal back to the Associated Coal Plant

at the same price as, or at a lower price than, the price at which the raw coal was purchased.  (*Cf.* Ex. 34 (Transcript of Jury Trial, Volume II, *Midwest Energy Emissions Corp. v. Arthur J. Gallagher & Co.*, No. 19-cv-1334 (D. Del. Apr. 4, 2025) (D.I. 782)) at 550:19–551:1; Ex. 32 at 638:1–6.)  Selling this refined coal back at a loss provided a financial incentive to the Associated Coal Plants to participate in Gallagher's coal-refining operations, allowing Gallagher and other investors to achieve an even greater financial boon in the form of the Section 45 tax credits.

107.    After establishing the onsite coal-refining facilities, the Refined Coal LLC would "purchase" and take control of the coal as it traveled on a conveyor belt, spray and mix the coal with the MerSorb and S-Sorb reagents, and route the coal back towards the Associated Coal Plant's furnace to be combusted.  (*Cf.* Ex. 33 at 992:24–993:22.)

108.    The Refined Coal LLC would then claim the Section 45 tax credits generated from "sale" of the refined coal to the Associated Coal Plant.  Those tax credits subsequently flowed through the Refined Coal LLC to Gallagher and the other investors who owned shares of the LLC.

109.    Gallagher reaped enormous profits from its refined coal operations.  On a 2018 call with investors, Gallagher's CFO Douglas Howell boasted, "'Our return on investment is staggering . . . . 200%, 300%, 400%, 500%.  I mean, just because it costs so little to develop' clean coal facilities."  (Ex. 35 (Tim McLaughlin, *Special Report: Wall Street Cleans up on 'Clean' Coal Subsidies*, Reuters (Dec. 4, 2018, 7:35 AM EST), https://www.reuters.com/article/business/special-report-wall-street-cleans-up-on-clean-coal-subsidies-idUSKBN1O31GA).)  From 2009 to 2023, Gallagher reported claiming a total of over $2.1 billion in tax credits from its coal-refining operations.  From the time that Gallagher and Chem-Mod were directly informed of the reissue of the RE'980 Patent and of their infringement

thereof (*see* Section C, *infra*), Gallagher and Chem-Mod made at least an estimated $492 million from their infringing activities, and coal treated with the Chem-Mod process generated at least an estimated $1.2 billion in market-wide tax credits.

110.     Beyond running its own coal-refining operations, Gallagher also assisted others in replicating its business model to reap further Section 45 tax credits.  Two of the largest coal-refining operations that licensed the Chem-Mod process and mimicked Gallagher's business model were run by entities known as CERT and DTE.  As Gallagher's CFO boasted about the coal-refining business model used by Gallagher, CERT, and DTE, "It is our machine.  We developed it.  We pioneered it."  (Ex. 35.)  With help from Gallagher, CERT and DTE mimicked Gallagher's business model, licensing the Chem-Mod process to run their own coal-refining facilities and generate Section 45 tax credits at additional Associated Coal Plants.  (*See* Ex. 32 at 860:15–22, 862:6–12.)

111.     Like Gallagher, CERT and DTE reaped enormous profits from their coal-refining operations.  Jeff Green, a CERT corporate representative, testified under oath that a subsidiary that comprised "[u]nder 20 percent" of CERT generated revenue "in the neighborhood of $50 million" from its refined-coal activities.  (Ex. 32 at 858:16–859:20.)  Overall, this would place CERT's revenue from refined coal at over $250 million.  DTE, meanwhile, reported $58 million in tax credits from its refined-coal operations in 2021 alone.  (Ex. 36 (DTE Energy Co., Form 10-K (2021)) at 13.)

112.     In sum, Defendants' business model included at least the relationships illustrated in the following diagram:



## C. Defendants' Knowledge of the RE'980 Patent

113.    Defendants have had knowledge of Dr. Vosteen's groundbreaking invention, the original patent underlying the reissue—the '358 Patent—and their infringement thereof since at least 2010.  NOx II Ltd., a Gallagher subsidiary that owned the intellectual property rights pertaining to the Chem-Mod process, cited the '358 Patent and other publications by Dr. Vosteen in its own patents.  For example, US 7,758,827, the earliest published patent assigned to NOx II Ltd., cites the '358 Patent, two other U.S. patent applications by Dr. Vosteen, and one published article by Dr. Vosteen.  (Ex. 37 (US 7,758,827) at 2–3.)  Thus, Gallagher, Chem-Mod, and the Gallagher Refined Coal LLCs—all of whom were, like NOx II Ltd., under the control of Gallagher and functioned as the agents and/or alter egos of Gallagher—had knowledge of the '358 Patent, and of their infringement thereof, at least as early as July 20, 2010, the publication date of this earliest NOx II Ltd. patent.  Because of Defendants' knowledge of the foundational '358 Patent and their infringement thereof, and their continued participation in the industry

through and beyond the date of the reissue, Defendants have also had knowledge of the patent-in-suit and their infringement thereof since at least May 12, 2020, the date of the reissue.

114.    Defendants have had further knowledge of the patent-in-suit and their infringement thereof since at least May 12, 2020, the date of the reissue, because Dr. Vosteen's pioneering work was foundational to and well known in the industry.   For example, Dr. Vosteen's original '358 Patent played a key role in prior litigation, which was ongoing at the time of the reissue, concerning Defendants' use of the Chem-Mod process.   On July 17, 2019, Midwest Energy Emissions Corporation filed a lawsuit against Gallagher; Chem-Mod; a subset of the Gallagher Refined Coal LLCs; and various CERT and DTE entities, power-plant operators, and other defendants, alleging that the Defendants' use of the Chem-Mod process infringed five asserted patents relating to mercury-removal technology.   *Midwest Energy Emissions Corp. v. Arthur J. Gallagher & Co.*, 19-cv-01334-cjb (D. Del. July 17, 2019).

115.    All five patents asserted by Midwest Energy Emissions came after Dr. Vosteen's '358 Patent, and all five cite Dr. Vosteen's work, including the original '358 Patent, as well as other patent applications by Dr. Vosteen related to similar technology and four papers published by Dr. Vosteen on the subject of bromine-mediated mercury capture.   Moreover, all five asserted patents disclose a mercury-removal process that incorporates and builds upon Dr. Vosteen's work by further specifying the sorbent used during the cleanup stage of Dr. Vosteen's process. For example, one of the asserted patents, US 10,343,114, discusses a "method of separating mercury from a mercury-containing gas," comprising adding bromine upstream or in the coal-combustion chamber, injecting an activated carbon sorbent, and performing a cleanup step to remove the mercury-containing sorbent, emulating Dr. Vosteen's prior pioneering work.   (*See* Ex. 38 (US 10,343,114) at 35:3–22.)   Dr. Vosteen's '358 Patent was so central to the Midwest

Energy Emissions patents that certain claims initially submitted with one of the Midwest Energy Emissions patent applications were rejected by the Examiner as obvious over Dr. Vosteen's patent.  Defendants therefore had knowledge of Dr. Vosteen's original '358 Patent and their infringement thereof since at least July 17, 2019, the date on which the *Midwest Energy Emissions* case was filed.

116.    Indeed, Dr. Vosteen's work is so foundational to the patents asserted by Midwest Energy Emissions, and to the field as a whole, that the Defendants' retained expert in the *Midwest Energy Emissions* case, Dr. Stephen Niksa, relied extensively on Dr. Vosteen's patent as a primary prior art reference to argue the invalidity of all five asserted patents.  In sworn testimony submitted to the court on behalf of and adopted by Defendants, Dr. Niksa confirmed that the industry, which included the Defendants, was well aware of Dr. Vosteen's work and the '358 Patent.  As Dr. Niksa explained on Defendants' behalf, after the successful experiments disclosed in Dr. Vosteen's patent, a person of ordinary skill in the art would have known of the effectiveness of bromine at removing mercury.  (*See* Ex. 39 (Opening Expert Report of Dr. Stephen Niksa (Oct. 25, 2022)) ¶ 161 (citing and discussing the '358 Patent).)  Defendants themselves, in sworn papers submitted to the court, relied upon and attached Dr. Niksa's expert report discussing Dr. Vosteen's Patent to support their motion for summary judgment.  (*See* Ex. 40 (Redacted Opening Brief in Support of Defendants' Motions for Summary Judgment and to Exclude Expert Witnesses and Testimony (March 23, 2023)) at xv, 1.)

117.    Dr. Vosteen's '358 Patent was also central to related IPR proceedings, which were also ongoing at the time of the RE'980 Patent's reissue.  During the pendency of the *Midwest Energy Emissions* litigation, two groups of defendant power-plant operators petitioned for *inter partes* review of two of the asserted patents.  *See* IPR2020-00832; IPR2020-00834;

IPR2020-00926; IPR2020-00928; IPR2020-01294; IPR2020-01295; IPR2020-01296; IPR2020-01297.  The IPR petitions all disclosed the ongoing *Midwest Energy Emissions* litigation as a related case, and several petitions disclosed Chem-Mod LLC and several Gallagher Refined Coal LLCs as potential real parties-in-interest.  Some of the petitions were filed just weeks before the RE'980 Patent was reissued, and some were filed less than one week after the reissue.  In those petitions, the petitioners cite Dr. Vosteen's '358 Patent, which they also attach as an exhibit. (*See, e.g.*, Ex. 41 (Petition for Inter Partes Review, IPR2020-00928 (May 27, 2020)) at vii.)

118.    During the IPRs, Dr. Stephen Niksa—the same expert concurrently and jointly retained by Gallagher and the power-plant defendants in the *Midwest Energy Emissions* litigation—represented under oath to the U.S. government that Dr. Vosteen's fundamental work was well known by industry participants like the Defendants.  In one declaration submitted in support of the IPR petitions, Dr. Niksa devotes almost one hundred pages to discussing Dr. Vosteen's '358 Patent.  (*See* Ex. 42 (Declaration of Dr. Stephen Niksa (Apr. 21, 2020)) at 219–307.)  Significant portions of those very same discussions were repeated verbatim in Dr. Niksa's later-filed declarations in the *Midwest Energy Emissions* litigation, which were submitted to the Court on behalf of (among others) the Defendants.  (*Compare, e.g.*, *id.* ¶¶ 149, 156–160 (discussing the '358 Patent and Dr. Vosteen's contributions to the state of the art); *with* Ex. 39 ¶¶ 152, 159–163 (reproducing the IPR Declaration's discussion of Dr. Vosteen's work).)  Thus, on information and belief, Defendants (along with their retained expert Dr. Niksa and the rest of the coal-burning industry) were extensively familiar with Dr. Vosteen's pioneering work, the '358 Patent, the RE'980 Patent, and their infringement thereof.

119.    On information and belief, the Defendants named in the *Midwest Energy Emissions* case consulted with Dr. Niksa and the power-plant defendants throughout the IPRs

and district-court litigation, reviewed Dr. Niksa's declarations and expert reports, and filed and argued motions based on those reports. In studying Dr. Vosteen's work and the '358 Patent, these Defendants kept abreast of the pending reissue proceedings and the publication of the reissued RE'980 Patent, which occurred in the midst of the IPRs and the *Midwest Energy Emissions* litigation and were matters of public record. Therefore, these Defendants knew of Dr. Vosteen's pioneering work, the '358 Patent, and the RE'980 Patent. Moreover, because the *Midwest Energy Emissions* litigation involved allegations that accused Defendants' use of the Chem-Mod process to remove mercury during coal combustion of infringement of patents that incorporate and build upon Dr. Vosteen's patented process, the Defendants named in the *Midwest Energy Emissions* case knew or should have known of their infringement of the RE'980 Patent. Gallagher, Chem-Mod, and the subset of the Gallagher Refined Coal LLC Defendants named as defendants by Midwest Energy Emissions thus have had further knowledge of the original '358 Patent and their infringement thereof since at least July 17, 2019, when the *Midwest Energy Emissions* case was filed, and have had knowledge of the patent-in-suit and their infringement thereof since at least May 12, 2020, the date of the reissue.

120. The remaining Gallagher Refined Coal LLC Defendants not named as defendants by Midwest Energy Emissions have also had knowledge of the '358 Patent and their infringement thereof since at least July 17, 2019, and of the patent-in-suit and their infringement thereof since at least May 12, 2020, as these remaining Gallagher Refined Coal LLCs act as the agents and/or alter egos of Gallagher and are entirely controlled by Gallagher.

121. Moreover, as confirmed by Dr. Niksa's sworn testimony submitted on behalf of the Defendants named in the *Midwest Energy Emissions* case, Dr. Vosteen's pioneering work was fundamental to the industry, and any industry participant, including all Defendants, would

have known of the '358 Patent and their infringement thereof by virtue of their participation in the industry. Absent willful blindness, any industry participant, including Defendants, would also have known of the reissue proceedings regarding this foundational patent and therefore of the RE'980 Patent itself and their infringement thereof. Based on the foregoing, and on information and belief, Defendants, like the rest of the coal-burning industry, were well aware of Dr. Vosteen's '358 Patent and the reissued RE'980 Patent, and of their infringement thereof.

122.    Defendants have had further knowledge of the patent-in-suit, and of their infringement thereof, since at least May 12, 2020.

123.    On May 12, 2020, immediately following reissue of the RE'980 Patent on that date, Bromerc Ltd. sent letters to Murray Abbott, the president of Chem-Mod LLC, and J. Patrick Gallagher Jr., President, CEO, and Chairman of Arthur J. Gallagher & Co. (Ex. 43 (Letter from Michael R. Weiner to Murray Abbott (May 12, 2020)); Ex. 44 (Letter from Michael R. Weiner to J. Patrick Gallagher Jr. (May 12, 2020)).) These letters informed Gallagher and Chem-Mod that the RE'980 Patent had been reissued, that the Chem-Mod process infringes the patent, and that Bromerc was open to entering into licensing discussions. (Ex. 43; Ex. 44).

124.    The Gallagher Refined Coal LLCs have also had further knowledge of the RE'980 Patent and their infringement thereof since the May 12, 2020 letters gave notice to Gallagher and Chem-Mod, as the Gallagher Refined Coal LLCs act as the agents and/or alter egos of Gallagher, are entirely controlled by Gallagher, and therefore share Gallagher's knowledge.

125.    On June 5, 2020, Chem-Mod's counsel sent a single-page response, summarily denying infringement without explanation. Gallagher never responded.

126.    On July 20, 2020, Bromerc's counsel replied with an exemplary claim chart that clearly outlined how the Chem-Mod process, based on information provided by Chem-Mod itself, practices at least claim 19 of the RE'980 Patent.  (Ex. 45 (Letter from Michael R. Weiner to George D. Moustakas (July 20, 2020)) at 2.)  Gallagher and Chem-Mod never responded and continued with their infringing activities.

127.    On July 18, 2024, Bromerc again sent letters to Gallagher and Chem-Mod, reminding them that the Chem-Mod process infringed the RE'980 Patent.  (Ex. 46 (Letter from Michael R. Weiner to J. Patrick Gallagher Jr. (July 18, 2024)); Ex. 47 (Letter from Michael R. Weiner to Murray Abbott (July 18, 2024)).)

128.    On August 27, 2024, Chem-Mod's counsel responded, acknowledging that Chem-Mod had reviewed the claim chart sent by Bromerc, not disputing any facts alleged as to the infringing steps of the Chem-Mod process, but nonetheless continuing to deny infringement. Gallagher once again never responded.

## COUNT I

### Infringement Of The RE'980 Patent

129.    Plaintiffs incorporate by reference paragraphs 1–128.

130.    The RE'980 Patent is valid and enforceable.

131.    Defendants infringed one or more claims of the RE'980 Patent under 35 U.S.C. § 271(a), either literally and/or under the doctrine of equivalents, by making, using, selling, and/or offering for sale in the United States, and/or importing into the United States, products and/or methods encompassed by those claims, including for example, by making, using, selling, offering for sale, and/or importing the Chem-Mod Solution and the MerSorb and S-Sorb reagents.

132.    For example, Defendants infringed at least exemplary claim 19 of the RE'980 Patent by using, selling, and/or offering to sell the Chem-Mod Solution.  For example, the Chem-Mod Solution is a process for removing mercury from mercury-containing flue gas of a furnace within which a combustion or incineration of coal containing sulfur is carried out, comprising the steps of:

a.  feeding bromine to the mercury-containing flue gas, the temperature during the first contact of the bromine with the mercury-containing flue gas being at least 800°C, and the combustion or incineration being carried out in the presence of a sulphur compound such that a gas phase reaction takes place between the bromine and the mercury so as to produce a bromine-contacted mercury-containing flue gas wherein the mercury is essentially completely oxidized (*see* Ex. 27 at 2 (explaining that the Chem-Mod Solution includes mixing coal with MerSorb, a 52% $CaBr_2$ solution, prior to combustion); *id.* (explaining that the bromine in MerSorb, upon combustion, reacts with and oxidizes elemental mercury in the flue gas); Ex. 29 at 1 (stating that coal combustion "takes place at temperatures from 1300–1700°C"));

b.  wherein said bromine is selected from the group consisting of bromine, a bromine compound, a mixture of bromine compounds and a mixture of bromine and a bromine compound or compounds, and wherein the feeding step feeds bromine to the furnace or to the flue gas of the furnace in a plant section downstream of the furnace, or to both the furnace and the flue gas (*see* Ex. 27 at 2 (explaining that the Chem-Mod Solution includes mixing coal with MerSorb, a 52% $CaBr_2$ solution, prior to combustion, which is then fed to the furnace)); and

    c.  subjecting the bromine-contacted mercury-containing flue gas to a cleanup for removing oxidized mercury whereby mercury is substantially removed from the bromine-contacted mercury-containing flue gas, wherein the cleanup includes at least one of a wet scrubbing stage and a dry cleanup stage, the dry cleanup stage comprising at least one sorbent (*see id.* (explaining that the Chem-Mod Solution includes mixing coal with S-Sorb, a dry sorbent, and that oxidized mercury can be removed by reacting with S-Sorb and/or a wet scrubber liquor)).

133.    As another example, Defendants infringed at least exemplary claim 20 of the RE'980 Patent by using, selling, and/or offering to sell the Chem-Mod Solution.  For example, the Chem-Mod Solution is a process according to claim 19 (*see* ¶ 132, *supra*), "wherein the feeding step comprises mixing the bromine with the coal to be combusted in the furnace, or upstream of the furnace."  (*See* Ex. 27 at 2 (explaining that MerSorb, a bromine solution, is mixed with the coal prior to combustion in the furnace).)

134.    Defendants Arthur J. Gallagher & Co., Chem-Mod LLC, and the Gallagher Refined Coal LLCs, including at least the Gallagher Refined Coal LLC Defendants, directly infringed the RE'980 Patent.  Chem-Mod acts as the agent and/or alter ego of Gallagher, as Gallagher and Chem-Mod share officers and a place of business, Chem-Mod has no apparent employees, and Gallagher had total operational control of Chem-Mod.  (*See* Ex. 31 at 35, 100 ("We are the manager (decision maker) of Chem-Mod LLC and therefore consolidate its operations into our consolidated financial statements.").)  The Gallagher Refined Coal LLCs act as the agents and/or alter egos of Gallagher, as, like Chem-Mod, the Gallagher Refined Coal LLCs are entirely controlled by Gallagher.

135.    The Gallagher Refined Coal LLCs directed and controlled the Associated Coal Plants' performance of the infringing process.  The Refined Coal LLCs conditioned benefits upon the Associated Coal Plants' performance of the infringing process, such that the plants reduced their mercury emissions and the Refined Coal LLCs could thus claim the Section 45 tax credits.  These conditional benefits included, at least: (1) profit the Associated Coal Plants made from repurchasing refined coal at a lower price than that at which they sold raw coal to the Refined Coal LLCs; (2) profit from leasing land to the Refined Coal LLCs to establish the onsite refining facilities; and (3) the ability to comply cheaply—indeed at a profit rather than at a loss—with regulatory requirements regarding mercury emissions.

136.    The Gallagher Refined Coal LLCs established the manner or timing of the Associated Coal Plants' performance of the infringing process by, at least: (1) performing individualized testing and optimization of all steps of the process, including the cleanup steps, at each plant; (2) instructing the plants as to how to best perform the steps of the infringing process; (3) mixing the raw coal with amounts of MerSorb and S-Sorb that the Refined Coal LLCs determined was appropriate; and (4) feeding the refined coal onto conveyor belts that led directly to the Associated Coal Plants' furnaces at a rate controlled by the Refined Coal LLCs.

137.    In the alternative, the Gallagher Refined Coal LLCs were engaged in a joint enterprise with their Associated Coal Plants to infringe the RE'980 Patent.  The Refined Coal LLCs and Associated Coal Plants had an agreement to collaborate to perform the infringing process.  Each Refined Coal LLC entered into a contract with an Associated Coal Plant, under which the Refined Coal LLC was to provide refined coal and the Associated Coal Plant was to combust the refined coal and perform the cleanup steps, thereby completing performance of the infringing process.

138.    The Gallagher Refined Coal LLCs and their Associated Coal Plants shared a common purpose of performing the infringing process and possessed a community of pecuniary interest in that purpose.  The Refined Coal LLCs needed the Associated Coal Plants to carry out the infringing mercury-removal process to earn the Section 45 tax credits.  By selling refined coal to the Associated Coal Plants at a loss, so long as the plants combusted the coal and performed the infringing process, the Refined Coal LLCs ensured that the Associated Coal Plants shared their pecuniary interest in performing the infringing process.

139.    The Gallagher Refined Coal LLCs and their Associated Coal Plants had an equal right to a voice in the direction of the joint enterprise, giving an equal right of control, as either contracting partner had the power to stop or continue the coal-refining operations.  Moreover, the Associated Coal Plants had immediate control over combustion of the coal and performance of the cleanup steps, as plant employees operated the plant machinery.  At the same time, the Refined Coal LLCs had control over performance of these steps by working with and instructing the Associated Coal Plants to optimize performance of these infringing steps, and by directly funneling refined coal into the furnaces of the plants, at a rate agreed upon with the plants and physically controlled by the Refined Coal LLC employees operating the refining machinery.

140.    Defendants Gallagher and Chem-Mod directly infringed the RE'980 Patent through the Gallagher Refined Coal LLCs, including at least the Gallagher Refined Coal LLC Defendants.  The Gallagher Refined Coal LLCs act as the agents and/or alter egos of Gallagher and Chem-Mod, as the Gallagher Refined Coal LLCs are entirely controlled by Gallagher and Chem-Mod.

141.    In the alternative, Defendants Gallagher and Chem-Mod directly infringed the RE'980 Patent because they directed and controlled performance of the infringing process by the

40

Gallagher Refined Coal LLCs, including at least the Gallagher Refined Coal LLC Defendants, and the Associated Coal Plants. Gallagher and Chem-Mod conditioned benefits upon the Gallagher Refined Coal LLCs' performance of the infringing Chem-Mod process. These conditional benefits included at least receipt of the Chem-Mod reagents and operational support, which allowed the Refined Coal LLCs to generate and claim Section 45 tax credits. Gallagher and Chem-Mod, including acting through the Gallagher Refined Coal LLCs, also conditioned benefits upon the Associated Coal Plants' performance of the infringing Chem-Mod process. *See* ¶ 135, *supra*. Gallagher and Chem-Mod, including acting through the Refined Coal LLCs, established the manner or timing of the Refined Coal LLCs' and Associated Coal Plants' performance of the infringing Chem-Mod process. *See* ¶ 136, *supra*.

142.    In addition, Gallagher, Chem-Mod, and the Gallagher Refined Coal LLCs— including at least the Gallagher Refined Coal LLC Defendants—directly infringed the RE'980 Patent by conducting, and/or by contracting third parties to conduct, periodic testing at each Associated Coal Plant, in order to demonstrate regulatory compliance such that Defendants' refined-coal production continued to qualify for Section 45 tax credits. Gallagher, Chem-Mod, and/or the Gallagher Refined Coal LLCs conducted and/or contracted third parties to conduct this testing at least every six months throughout the operation of their coal-refining facilities. (*See* Ex. 48 (IRS Notice 2009-90) § 6.04.) Performance of this testing comprised Gallagher, Chem-Mod, and/or the Gallagher Refined Coal LLCs performing all steps of the infringing process and/or a contracted third party performing all steps of the infringing process at the direction of Gallagher, Chem-Mod, and/or the Gallagher Refined Coal LLCs.

143.    Defendants have had knowledge and notice of the RE'980 Patent and their infringement thereof since at least May 12, 2020, through letters sent by Bromerc to Gallagher

41

and Chem-Mod informing them of the reissue of the RE'980 Patent and of their infringement thereof.  *See* ¶¶ 122–128, *supra*.

144.    In addition and in the alternative, Defendants have had knowledge and notice of the original '358 Patent and their infringement thereof since at least July 17, 2019, the filing date of the *Midwest Energy Emissions* case, which named Gallagher, Chem-Mod, and several Gallagher Refined Coal LLCs as defendants, and which alleged infringement of five patents citing the '358 Patent and other work by Dr. Vosteen.  *See* ¶¶ 114–120, *supra*.

145.    In addition and in the alternative, Defendants have had further knowledge and notice of the RE'980 Patent and their infringement thereof since at least May 12, 2020, the date of the reissue, as Defendants were aware of the reissue due to their then-ongoing involvement in the *Midwest Energy Emissions* litigation and their extensive awareness of Dr. Vosteen's work and the '358 Patent through that litigation.  *See* ¶¶ 114–120, *supra*.

146.    In addition and in the alternative, Defendants have had knowledge and notice of the original '358 Patent and their infringement thereof since at least July 20, 2010, the publication date of NOx II Ltd.'s US 7,758,827 patent citing the original '358 Patent and other work by Dr. Vosteen.  *See* ¶ 113, *supra*.

147.    In addition and in the alternative, Defendants have had knowledge and notice of the original '358 Patent and their infringement thereof since they first began their coal-refining operations, as Dr. Vosteen's patent was foundational to the industry and well known by industry participants, including Defendants, as confirmed by sworn expert testimony submitted on Defendants' behalf during the *Midwest Energy Emissions* litigation.  *See* ¶¶ 114–121, *supra*.

148.    To the extent any Defendant asserts lack of actual knowledge of the '358 Patent, the RE'980 Patent, and its infringement thereof, such Defendant was willfully blind.

149.    Defendants Arthur J. Gallagher & Co. and Chem-Mod LLC have also induced infringement of one or more claims of the RE'980 Patent under 35 U.S.C. § 271(b).  Gallagher and Chem-Mod actively, knowingly, and intentionally induced infringement of the RE'980 Patent by licensing the Chem-Mod Solution and selling or otherwise supplying the MerSorb and S-Sorb reagents; with the knowledge and intent that third parties—including at least CERT, DTE, Gallagher Refined Coal LLCs, other third-party Refined Coal LLCs, and third-party coal plants—would use, sublicense, sell, and/or offer for sale in the United States the Chem-Mod Solution and the MerSorb and S-Sorb reagents supplied by Gallagher and Chem-Mod to infringe the RE'980 Patent; and with the knowledge and intent to encourage and facilitate this third-party infringement through the dissemination of the Chem-Mod Solution and the MerSorb and S-Sorb reagents and/or the creation and dissemination of promotional and marketing materials, supporting materials, instructions, product manuals, and/or technical information related to the Chem-Mod Solution and the MerSorb and S-Sorb reagents.

150.    Defendants Arthur J. Gallagher & Co. and Chem-Mod LLC specifically intended and were aware that the ordinary and customary use of the Chem-Mod Solution and the MerSorb and S-Sorb reagents would infringe the RE'980 Patent.  For example, Gallagher and Chem-Mod licensed the Chem-Mod Solution and sold or otherwise supplied the MerSorb and S-Sorb reagents, which, when used in their ordinary and customary manner, as intended and instructed by Gallagher and Chem-Mod, infringe one or more claims of the RE'980 Patent, including at least exemplary claims 19 and 20.  Gallagher and Chem-Mod further provided operational support and assisted with testing and optimization of the Chem-Mod Solution at third-party coal plants, which caused third-party coal-refining facilities and coal plants to operate the Chem-Mod Solution and use the MerSorb and S-Sorb reagents for their ordinary and customary use.

Gallagher and Chem-Mod further provided financial incentives to third-party coal plants to operate the Chem-Mod Solution and use the MerSorb and S-Sorb reagents for their ordinary and customary use. In fact, Defendants Gallagher and Chem-Mod needed these third parties to infringe so that Gallagher and Chem-Mod, through the Gallagher Refined Coal LLCs, could generate and collect Section 45 tax credits. Defendants Gallagher and Chem-Mod accordingly have induced third parties to use the Chem-Mod Solution and the MerSorb and S-Sorb reagents in their ordinary and customary way to infringe the RE'980 Patent, knowing, or at least being willfully blind to the fact, that such use constitutes infringement of the RE'980 Patent.

151.    Defendants Arthur J. Gallagher & Co. and Chem-Mod LLC have also contributed to the infringement by third parties—including at least CERT, DTE, Gallagher Refined Coal LLCs, third-party Refined Coal LLCs, and third-party coal plants—of one or more claims of the RE'980 Patent under 35 U.S.C. § 271(c), by licensing and/or offering to license the Chem-Mod Solution and making, selling, and/or offering for sale the MerSorb and S-Sorb reagents in the United States, knowing that those products constitute a material part of the inventions of the RE'980 Patent, knowing that those products are especially made or adapted to infringe the RE'980 Patent, and knowing that those products are not staple articles of commerce suitable for substantial non-infringing use.

152.    In addition and in the alternative, the Gallagher Refined Coal LLCs indirectly infringed the RE'980 Patent, in the same manner as Gallagher and Chem-Mod, *see* ¶¶ 149–151, *supra*, by inducing infringement by and contributing to the infringement of third parties, including at least the Associated Coal Plants.

153.    Defendants' infringement of the RE'980 Patent was willful and deliberate, since at least May 12, 2020, when Gallagher and Chem-Mod received letters from Bromerc informing them of the reissue of the RE'980 Patent and of their infringement thereof.

154.    In addition and in the alternative, Defendants' infringement of the RE'980 Patent was willful and deliberate since at least July 17, 2019, the filing date of the *Midwest Energy Emissions* case, which alleged infringement of five patents citing the '358 Patent and other work by Dr. Vosteen.

155.    In addition and in the alternative, Defendants' infringement of the RE'980 Patent was willful and deliberate since at least July 20, 2010, the publication date of NOx II Ltd.'s US 7,758,827 patent citing the original '358 Patent and other work by Dr. Vosteen.

156.    In addition and in the alternative, Defendants' infringement of the RE'980 Patent was willful and deliberate since at least the date on which they first began their coal-refining operations, as Dr. Vosteen's patent was foundational to the industry and well known by industry participants, including Defendants, as confirmed by sworn expert testimony submitted on Defendants' behalf during the *Midwest Energy Emissions* litigation.

157.    To the extent any Defendant asserts lack of actual knowledge of the RE'980 Patent and its infringement thereof, such Defendant's infringement was willful and deliberate because such Defendant was willfully blind to the existence of the RE'980 Patent and its infringement thereof.

158.    Bromerc and Mercex have been damaged by Defendants' infringement of the RE'980 Patent.

159.    Plaintiffs are entitled to past damages for Defendants' infringement of the RE'980 Patent.  Plaintiffs have complied with the requirements of 35 U.S.C. § 287, at least because all

claims of the RE'980 Patent and the original '358 Patent are method claims for which no marking is required and/or there is nothing to mark.

160.    Defendants' conduct in infringing the RE'980 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

### Prayer For Relief

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    That Defendants have infringed the RE'980 Patent;

B.    That Defendants' infringement of the RE'980 Patent has been willful;

C.    That Plaintiffs be awarded all damages adequate to compensate them for Defendants' past infringement of the RE'980 Patent up until the date such judgment is entered, including pre- and post-judgment interest, costs, and disbursements as justified under 35 U.S.C. § 284, and that Defendants provide an accounting of the same;

D.    That any award of damages be enhanced under 35 U.S.C. § 284 as a result of Defendants' willful infringement;

E.    That this case be declared an exceptional case within the meaning of 35 U.S.C. § 285 and that Plaintiffs be awarded the attorneys' fees, costs, and expenses incurred in connection with this action; and

F.    That Plaintiffs be awarded such other and further relief at law or equity as this Court deems just and proper.

### Demand For Jury Trial

Plaintiffs Bromerc and Mercex hereby demand a trial by jury on all issues so triable.

Dated: March 2, 2026                          Respectfully submitted,


OF COUNSEL:                                   FARNAN LLP

Paul A. Bondor                                /s/ Brian E. Farnan
Raymond N. Habbaz                             Brian E. Farnan (Bar No. 4089)
DESMARAIS LLP                                 Michael J. Farnan (Bar No. 5165)
230 Park Avenue                               919 N. Market Street, 12th Floor
New York, NY 10169                            Wilmington, Delaware 19801
Telephone: 212-351-3400                       (302) 777-0300
Facsimile: 212-351-3401                       bfarnan@farnanlaw.com
pbondor@desmaraisllp.com                      mfarnan@farnanlaw.com
rhabbaz@desmaraisllp.com
                                              *Attorneys for Plaintiffs*